# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### March 26, 2013 Session

## STATE OF TENNESSEE v. JOSH L. BOWMAN

**Direct Appeal from the Criminal Court for Knox County**
**No. 92152A      Jon Kerry Blackwood, Judge**

---

**No. E2012-00923-CCA-R3-CD - FiledAugust 29, 2013**

---

A Knox County Criminal Court Jury convicted the appellant, Josh L. Bowman, of three counts of first degree felony murder, one count of especially aggravated kidnapping, one count of especially aggravated robbery, two counts of aggravated burglary, and one count of employing a firearm during the commission of a dangerous felony.  After the jury announced its verdicts, the appellant pled guilty to one count of employing a firearm during the commission of a dangerous felony when, at the time of the offense, the appellant had a prior felony conviction.  The trial court merged the murder convictions, merged the burglary convictions, merged the employing a firearm convictions, and sentenced the appellant to an effective sentence of life plus sixty years in confinement.  On appeal, the appellant contends that the trial court erred by failing to suppress his statement to police, by allowing the State to show a transcript of his statement simultaneously with his video-recorded statement, and by failing to instruct the jury as provided by State v. White, 362 S.W.3d 559 (Tenn. 2012).  Based upon the oral arguments, the record, and the parties' briefs, we conclude that the trial court's failing to instruct the jury properly pursuant to White constitutes reversible error.  Therefore, the appellant's conviction for especially aggravated kidnapping must be reversed and the case remanded to the trial court for a new trial as to that offense.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed in Part, Reversed in Part, and the Case is Remanded.**

NORMA MCGEE OGLE, J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER, J., joined.  THOMAS T. WOODALL, J., filed a separate dissenting opinion.

Mike Whalen, Knoxville, Tennessee, for the appellant, Josh L. Bowman.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; Randall E. Nichols, District Attorney General; and TaKisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## I. Factual Background

This case relates to the home invasion robbery of Bill and Vickie Graves on May 2, 2009, by the appellant and his co-defendant, Gary S. Holman. The defendants were indicted jointly but tried separately. Although the appellant does not contest the sufficiency of the evidence, we will summarize the evidence presented at trial.

Michael Allen Mays of the Knox County Emergency Communications District, 911, testified that on May 2, 2009, a call was received from a home on Washington Pike. The State played the audio-recorded call for the jury.

Sergeant Frank Phillips of the Knox County Sheriff's Office (KCSO) testified that on May 2, 2009, he was dispatched to the Graves home on Washington Pike. As Officer Phillips drove to the scene, he saw a safe in the center of Washington Pike with the contents of the safe spread out on the side of the road. Sergeant Phillips went into the house and found Mr. Graves lying on the floor in the doorway between the master bedroom and the living room. Mr. Graves was bleeding heavily from a gunshot wound, and Mrs. Graves was applying pressure to the wound. A gun was on the floor beside Mr. Graves.

Natasha Wise, a paramedic with Rural Metro, testified that when paramedics arrived at the scene, firemen were "working on" Mr. Graves. The paramedics cut off Mr. Graves's clothes, wrapped his leg as best they could, and transported him to a hospital. On the way to the hospital, Wise gave him intravenous fluids and oxygen. His blood pressure was low, and his level of consciousness decreased. Mr. Graves had lost a lot of blood and needed to get to a hospital quickly in order to get blood.

Officer Mackenzie Alleman of the KCSO's Forensic Services Division testified that she responded to the crime scene on the night of May 2 and took photographs of a medium-sized safe in the middle of Washington Pike and items scattered around the safe. As she entered the driveway of the Graves home, she saw and collected a folded knife in a black nylon case. Officer Alleman photographed blood droplets on the front porch and collected evidence from inside the home, including a spent Winchester .45 caliber shell casing and a black toboggan just inside the front door; a Mauser nine millimeter pistol containing five live .380 automatic rounds in the hallway in front of the master bedroom; another .45 caliber Winchester spent shell casing in front of the bedroom door; a bullet in a paperback book in the bedroom closet; and a bullet that had traveled through the wall in the hallway, separated from its metal jacket, and landed on the floor under the kitchen sink. On cross-examination, Officer Alleman testified that she did not know if the safe was processed for fingerprints.

-2-

Officer Aaron Allen testified that he assisted Officer Alleman on May 2. He found two black cloth gloves on the side of Washington Pike near the Graves home. Inside the home, police officers found two bullets. One bullet had traveled through an interior wall and landed on the kitchen floor by the sink. The other bullet was fired into the master bedroom closet and came to rest in a paperback book in the closet. On May 13, 2009, Officer Allen was called back to the scene and collected a Ruger firearm from underneath some bushes in a tree line outside the home. The gun was loaded with three .45 caliber hollow point bullets.

Lieutenant John Hopkins of the KCSO testified that he and other Knox County officers began looking for the appellant and learned that he was at a house in Loudon County. When officers arrived at the home, the appellant was standing on the front porch. They handcuffed him, and he gave them consent to search the residence. During the search, the officers collected clothing and a gun cleaning kit. Lieutenant Hopkins said no one threatened the appellant's life.

Detective Aaron Yarnell of the KCSO testified that in May 2009, the appellant became a suspect in the home invasion and shooting of Mr. Graves. Knox County officers learned that the appellant was at a home in Loudon County, met with Loudon County police officers, went to the home, and arrested the appellant. Detective Yarnell said that he was behind the house during the appellant's arrest, that he never heard anyone threaten the appellant, and that he never saw anyone throw the appellant to the ground. The appellant was not bruised or bleeding, and he gave officers consent to search the home. While officers were conducting the search, Detective Yarnell, Officer Mark Webber, and Officer David Henderson drove the appellant to the Knoxville City-County Building. When they arrived, they put him into an interview room. The appellant asked for some water and a cigarette, and the officers gave the items to him. They advised the appellant of his rights, the appellant signed a waiver of rights form, and the appellant gave a statement.

Detective Yarnell testified that the appellant stated as follows: Chad Medford, a relative of Mr. and Mrs. Graves, told the appellant and Holman that the Graveses had "come across some money." On May 2, Medford drove the appellant and Holman to the Graves home on Washington Pike. Medford stayed in the car, and the appellant and Holman entered the home through the unlocked front door. The appellant had a handgun, and both men were wearing bandanas over their faces. The appellant got into a physical altercation with Mr. Graves while Holman got into an altercation with Mrs. Graves. The appellant yelled for Holman to help him with Mr. Graves, so Holman released Mrs. Graves and helped the appellant try to control Mr. Graves. At some point, Holman ended up with the appellant's gun. The appellant saw Mrs. Graves trying to get a weapon in the living room, so he let go of Mr. Graves and grabbed Mrs. Graves. He heard two or three gunshots, and he and Holman carried the safe from the home. They ran down the driveway and toward the car

where Medford was waiting. They dropped the safe, it "busted open," and they "scooped up" as much change and property as they could. They got into the car, and Medford drove them away from the scene. The men went to a motel on Merchants Drive and divided the change, which ended up being about $85 per person.[1]

On cross-examination, Detective Yarnell acknowledged that before the appellant signed the waiver of rights form, the appellant told him that an officer had threatened the appellant. Detective Yarnell said that he did not ask the appellant about the threat and that he did not know who made the threat. Detective Yarnell acknowledged that guns were drawn during the appellant's arrest. However, Detective Yarnell was behind the house and did not hear the arresting officers yell at the appellant. The appellant ultimately signed the waiver of rights form and gave his statement.

Angie Varner, a forensic services technician for the KCSO, testified that she assisted with the collection of buccal swabs from the appellant and Holman on May 13, 2009. She sent the swabs to the Tennessee Bureau of Investigation (TBI).

Jerry Harmon, the Lieutenant of Corrections at the Knox County Detention Facility, testified that someone from the KCSO's Major Crimes Department contacted him and asked if the appellant would consent to a search of the appellant's car. On May 13, 2009, Lieutenant Harmon read a consent to search form to the appellant, and the appellant signed the form.

Officer Michael McMahan, a crime scene technician for the KCSO, testified that he searched the appellant's car for evidence at Cedar Bluff Towing. Officer McMahan found a pair of boots, a black and white scarf, a black glove, and a toboggan in the trunk. He found red stains inside the passenger compartment, collected a sample of the stains, and sent the samples to the TBI.

Officer Tom Finch of the KCSO testified that on May 12, 2009, he went to the Graves home, took additional photographs, and collected t-shirt material from the side of Washington Pike. On January 11, 2010, Officer Finch returned to the scene and collected a Colt .45 pistol across the street from the house. He said that the gun was "frozen solid" and that it had been easier for officers to find the gun in January than May because the vegetation

---

[1]For his participation in the crimes, a jury convicted Medford of first degree felony murder, two counts of aggravated burglary, two counts of especially aggravated kidnapping, two counts of especially aggravated robbery, and employing a firearm during commission of a dangerous felony. State v. Chad Medford, No. E2012-00335-CCA-R3-CD, 2013 Tenn. Crim. App. LEXIS 475, at *21 (Knoxville, June 5, 2013).

had died or been cut down. Officer Finch collected buccal swabs from Mrs. Graves and Chad Medford and a blood sample from Mr. Graves and sent the evidence to the TBI.

Vickie Graves testified that she married Bill Graves in 1979 and that they had one son. In December 2004, Mrs. Graves's nephew, Tony Wood, died. At the time of his death, Mr. Wood had been in the process of divorcing his wife, Tiffany, and had named Mrs. Graves as the beneficiary of his life insurance policy. Tiffany Wood was the sister of Chad Medford.

Mrs. Graves testified that on the evening of May 2, 2009, Mr. Graves was sitting in his recliner and she was sitting on the love seat in their living room. The front door was open, and the front screen door was closed but unlocked. About 9:00 p.m., the couple heard a "buzz" from their alarm, letting them know that someone was in their driveway. Mr. Graves got up to look outside. As soon as he got to the front door, a man jerked open the screen door, came inside, and grabbed Mr. Graves in a "bear hug." A second man came in behind the first man, and both men had their faces covered.

Mrs. Graves testified that she stood up, that the second man told her to sit down, and that he put a gun to her head. Mr. Graves saw the gun pointed at his wife, broke away from the first man, and ran toward the bedroom with the first man "right after him." Mrs. Graves begged the second man not to hurt her husband. She said she heard a "pop" and started screaming. She heard a second "pop" and called out to Mr. Graves, but he did not answer. Mrs. Graves pushed the second man away and grabbed a gun that Mr. Graves kept near his recliner. She tried to shoot the second man, but the gun would not fire. She and the second man struggled over the gun, and she heard the first man say, "'Get the safe.'" The second man answered, "'I can't. She's got a goddamn gun.'" Mrs. Graves pulled off the second man's toboggan, pulled down his bandana, and saw Gary Holman. She said she had never seen Holman before that night.

Mrs. Graves testified that she ran toward the bedroom but that Holman tackled her on the love seat and bit her arm. He took her husband's gun away from her and pushed her further into the love seat. Then he went to the front door, shut it, and opened the door to a coat closet that had been behind the open front door. Holman reached down, picked up a safe in the closet, and went out the front door followed by the first man. Mrs. Graves telephoned 911 and went to her husband. Blood was gushing from his upper thigh. He was coherent but could not talk, and Mrs. Graves put a shirt over his wound until the police and paramedics arrived. Mr. Graves was transported to a hospital and received blood transfusions. He died the next day.

Mrs. Graves testified that the gun officers found on the floor next to Mr. Graves may have been a gun he kept on top of a gun rack in their bedroom. She said that she never saw

the first man's face and that she had never met the appellant before May 2, 2009. She stated that the only people who knew about the safe were herself, her husband, their son, Tony Wood, and Tiffany Wood. Tony Wood did not know where Mr. and Mrs. Graves kept the safe. On the night of the robbery, the safe contained some personal papers and a coin collection, including a jar of fifty-cent pieces, some silver dollars, three state quarter sets, and some old nickels. The safe did not contain any paper money. On cross-examination, Mrs. Graves acknowledged that she could not identify the appellant as one of the robbers.

Kimberly Bryant testified as an expert in serology that in 2009, she was a special agent forensic scientist with the TBI's Serology/DNA Unit. She tested evidence received in this case, including buccal swabs from the appellant, Holman, Medford, and Mrs. Graves and blood from Mr. Graves. Bryant found a mixture of DNA from three males on the outside of the pair of gloves found near the Graves home, and Mr. Graves's blood was a major contributor to the DNA. Bryant obtained a partial profile for DNA inside the gloves. At least three people contributed to the partial profile, and Holman could not be excluded as a possible contributor. The blood on the front porch came from Mr. Graves. Mr. Graves's blood also was on the outside of the pair of boots found in the trunk of the appellant's car. On cross-examination, Bryant testified that out of the twenty-nine items she tested, the only item that contained the appellant's DNA was his buccal swab.

Kevin Warner, a special agent forensic scientist with the TBI, testified as an expert in firearms examination that he examined the Ruger semi-automatic pistol and its magazine containing Winchester .45 caliber hollow point bullets. He also examined two shell casings found in the home. Warner test-fired the Ruger and determined that the shell casing by the front door and the shell casing near the bedroom were fired from the gun. A bullet jacket found by the kitchen sink and the bullet recovered from the paperback book in the bedroom closet also were fired from the Ruger. On cross-examination, Warner acknowledged that he could not determine who fired the gun.

Don Carmen, a forensic firearms examiner for the TBI, testified as an expert in firearms examination that he examined a corroded Colt .45 caliber automatic/semi-automatic pistol. Carmen had to soak the gun in a penetrating liquid in order to make it operational. He said that the gun may not have fired when someone pulled the trigger because the gun was unloaded or because one of the gun's safety mechanisms prevented it from firing.

Steven Cogswell, the Deputy Chief Medical Examiner for Knox County, testified that he prepared Mr. Graves's autopsy report. Mr. Graves received a gunshot wound to the left thigh. The bullet entered the lower edge of Mr. Graves's left buttock, struck his femoral artery and femoral vein, and exited the front of his leg in the groin area. The bullet traveled back to front and very slightly upward, and Dr. Cogswell found no evidence, such as soot or

stippling, to indicate that the wound was a close-contact wound. The wound was consistent, however, with Mr. Graves's having been shot with his back to the shooter. Dr. Cogswell said that the victim survived in the hospital but died on May 3 due to the shock caused by blood loss "on top of his underlying natural disease." The cause of death was a gunshot wound to the left thigh, and the manner of death was homicide.

At the conclusion of Dr. Cogswell's testimony, the State rested its case. The appellant did not present any proof, and the jury convicted him as charged of count 1, aggravated burglary by entering a habitation with the intent to commit a theft, a Class C felony; count 2, aggravated burglary by entering a habitation and committing a felony, a Class C felony; count 3, employing a firearm during the commission of a dangerous felony, a Class C felony; count 6, the especially aggravated kidnapping of Mrs. Graves, a Class A felony; count 7, first degree felony murder committed in the perpetration of burglary; count 8, first degree felony murder committed in the perpetration of theft; count 9, first degree felony murder committed in the perpetration of robbery; and count 10, the especially aggravated robbery of Mr. Graves, a Class A felony. After the jury announced its verdicts, the appellant pled guilty as charged in count 4 to employing a firearm during the commission of a dangerous felony when, at the time of the offense, the appellant had a prior felony conviction.[2] The trial court immediately merged the murder convictions and sentenced the appellant to life. After a sentencing hearing, the trial court found the appellant to be a career offender. It merged his aggravated burglary convictions and merged his convictions for employing a firearm during the commission of a dangerous felony. The trial court sentenced the appellant to fifteen years for aggravated burglary, fifteen years for employing a firearm during the commission of a dangerous felony, sixty years for especially aggravated kidnapping, and sixty years for especially aggravated robbery. The trial court ordered that the fifteen-year sentence for aggravated burglary run concurrently with his life sentence, that the fifteen-year sentence for employing a firearm during the commission of a dangerous felony run consecutively to the aggravated burglary sentence, and that the sixty-year sentences for especially aggravated kidnapping and especially aggravated robbery run concurrently with each other but consecutively to the life sentence.

## II. Analysis

### A. Motions to Suppress

First, the appellant contends that the trial court erred by not suppressing his statement to police. The appellant contends that his statement to officers was involuntary because the officers threatened him with violence prior to giving him <u>Miranda</u> warnings. The appellant

---

[2]Count 5 of the indictment charged Holman with the same offense.

also contends, without any supporting argument, that the trial court should have suppressed evidence found during a search of his home because he did not voluntarily agree to the search. The State argues that the trial court properly denied the motions to suppress. We agree with the State.

Before trial, the appellant filed a motion to suppress his statement to police on the basis that he did not give his statement voluntarily. At the suppression hearing, Detective Yarnell testified that the appellant became a suspect in the crimes, that KCSO officers met with Loudon County officers, and that officers from both counties went to the appellant's home in Philadelphia, Tennessee. Detective Yarnell said that he went to the back of the residence "to cover the rear" while other officers went to the front of the home. At some point, Detective Yarnell learned that the officers had arrested the appellant and went to the front of the house. The appellant was cooperative and talking with the officers. He gave them consent to search the home, Detective Yarnell read a consent to search form to him, and he signed the form. The officers searched the residence and had the appellant's vehicle towed from the scene. Detective Yarnell and two other KCSO officers transported the appellant to the Knoxville City-County Building for an interview. Detective Yarnell said that during the drive, which lasted about forty minutes, the appellant "had questions about what was going on." Detective Yarnell told the appellant that he would discuss the case after he read Miranda warnings to the appellant. Officers did not threaten or beat the appellant at the house or during the drive to Knoxville.

Detective Yarnell testified that the appellant asked for cigarettes at the City-County Building and that officers gave him cigarettes. Detective Yarnell read a waiver of rights form to the appellant, the appellant initialed each right as it was read to him, and the appellant signed the portion of the form stating that no threats, promises, or coercion had been used to obtain his statement. Detective Yarnell interviewed the appellant, and the appellant admitted his involvement in the case. Officers did not threaten the appellant during the interview, and the interview was audio- and video-recorded. After the interview, the appellant asked for a drink of water, and officers gave him water. The appellant also asked to talk with his wife. Officers contacted her, she came to the building, and the appellant spoke with her.

On cross-examination, Detective Yarnell acknowledged that the appellant was a high school graduate and that he had no doubt the appellant could read. He also acknowledged that he was the first officer to read Miranda warnings to the appellant and said that he did not ask the appellant about the case until he read the warnings to the appellant in the interview room. Detective Yarnell spoke with the appellant at the home in Philadelphia but only asked the appellant for consent to search the home. Detective Yarnell said that during the drive from Philadelphia to Knoxville, the appellant was "trying to locate [Holman], because he was

another person in the case that we needed to speak with." Holman was in the City-County Building at the time of the appellant's interview, but Detective Yarnell did not know how Holman arrived there.

Detective Yarnell testified that he read six rights to the appellant and that the appellant initialed each one. He acknowledged that when he asked the appellant to initial the portion of the form that said no threats had been made, the appellant stated, "'But I told you about that. You know, they did that to me.'" Detective Yarnell also acknowledged that he answered, "'Well, that was those guys, not us.'" Detective Yarnell explained that he did not know what the appellant was talking about and that he was "advising [the appellant] that there [were] other people there at the residence. I was not aware of any threats that had been made." Detective Yarnell said he did not remember the appellant's telling him that someone put a gun to the appellant's head or that someone told the appellant that the appellant may not see his children again if the appellant did not do what the officers told him to do. Detective Yarnell read that portion of the form to the appellant again, the appellant initialed the statement saying that no threats had been made, and the appellant signed the waiver of rights form. Detective Yarnell said that he did not ask the appellant about the alleged threat because "I was not questioning [him] about any other incident than the homicide. That's why I reread the rights waiver to him on the box that he had a question about, which he then said he understood and signed."

Lieutenant Hopkins testified that Knox County officers learned the appellant was in Loudon County and went to a home in Philadelphia to arrest him. When they pulled into the driveway, the appellant came out of the home, and Lieutenant Hopkins and two other officers took him into custody. Lieutenant Hopkins did not threaten the appellant, did not throw him onto the ground, did not put a gun to his head, and did not tell him that he would never see his children again if he did not cooperate. After the appellant's arrest, he signed a consent to search form, and Lieutenant Hopkins and other officers conducted the search. Lieutenant Hopkins said that no one threatened, beat, or coerced the appellant and that any such claims by the appellant were lies.

On cross-examination, Lieutenant Hopkins testified that the appellant came onto the porch, that an officer ordered him to get onto the ground, and that the appellant did as the officer ordered. Lieutenant Hopkins did not see anyone touch the appellant. Lieutenant Hopkins had drawn his weapon but did not know if the other officers were holding their weapons. While Lieutenant Hopkins was searching the appellant's home, other officers transported the appellant to Knoxville.

Lieutenant Paul Curtis of the Loudon County Sheriff's Office testified that on May 12, 2009, Loudon County officers were asked to assist Knox County officers with the arrest

of a suspect in a homicide case. Lieutenant Curtis and two other Loudon County officers went to the location, and Lieutenant Curtis pulled into the back yard "to cover the back door." He said the other two officers were "between the structure of the residence and Highway 11." Lieutenant Curtis learned that the appellant was in custody, went to the front of the house, and saw the appellant on the front porch. The Loudon County officers did not arrest the appellant, did not point a gun at him, did not put a gun to his head, did not put him onto the ground, and did not threaten him. Lieutenant Curtis denied that officers told the appellant they were "going to do to him the exact same thing that he did to that old man." He said that he only knew the case involved a homicide and that "I didn't have any vested interest in the case at all."

On cross-examination, Lieutenant Curtis testified that he could not see the front porch at the time of the appellant's arrest. Lieutenant Curtis also did not hear what officers told the appellant when they approached him.

Brian Davis of the Knoxville Police Department testified that in December 2002, he read a waiver of rights form to the appellant. The appellant signed the form. On cross-examination, Davis testified that he was questioning the appellant about a robbery.

The appellant testified on his own behalf that on the day in question, he was at home with his children. He said that he "saw some activity outside [his] window," that he stepped outside, and that he saw officers running toward his front door. One of the officers grabbed him and threw him onto the ground. The appellant said the officer put a gun to his head and told him, "'I should do to you what you did to that old man.'" The officer also told him, "'You need to do what they tell you to do, or you--or you will not see your children again.'" The appellant said that he took the officer's statement as a threat against his life or the lives of his children and that he was scared and confused. He said that at least ten police officers were present and that he did not know which one made the threat. He acknowledged that he signed a consent to search form but said that he was on his way to Knoxville while officers conducted the search.

The appellant testified that two officers transported him to the City-County Building. One of them was Detective Yarnell. During the appellant's interview with Detective Yarnell, the appellant did not know if one of the officers present was the officer who had threatened him. He told Detective Yarnell about the threat, but Detective Yarnell did not ask him any questions about it. He acknowledged that officers allowed him to smoke a cigarette and see his wife. He also acknowledged that he signed the consent to search form but said, "They didn't ask me. They told me." He said that after his arrest, an officer took him back into the house and told him, "'Make it light on yourself. Tell me about [Holman].'" Officers had not read <u>Miranda</u> warnings to the appellant, and he did not give them any information about

Holman at that time. However, while the officers were transporting him to Knoxville, they asked him about Holman and asked if he could contact Holman. Detective Yarnell gave the appellant's cellular telephone to the appellant so that the appellant could call Holman. The appellant telephoned Holman and spoke with him. When the appellant arrived at the City-County Building, Holman was there. He said that he did not actually see Holman but that officers told him Holman was in the building. The appellant had no reason to doubt the officers.

On cross-examination, the appellant testified that the officers asked if he could get in touch with Holman but did not tell him why they wanted to speak with Holman. The officers did not talk with him about the case during the drive to Knoxville or prior to recording his interview in the interview room. The appellant told Detective Yarnell before the call to Holman that he had been threatened. He said that he thought the threatening officer had a mustache and that the officer held the gun to his head until other officers handcuffed him. The appellant said that even after the threatening officer removed the gun, he remained scared because "[o]f what could happen." He said he signed the consent to search form because "[t]hey just told me to sign it." He acknowledged that he read the waiver of rights form, that he initialed his rights, and that he signed the form. He said he gave his statement because he "feared for his life" and because he did not think he had a choice.

The trial court initially noted that the appellant made no implicating statements prior to receiving Miranda warnings. The court then stated that there was no evidence in the record that an officer had threatened the appellant. The court found the appellant not credible and concluded that, even if an officer made a threat, the officers who conducted the appellant's interview determined that he was giving his statement knowingly and voluntarily. The trial court denied the appellant's motion to suppress his statement. On the morning of trial, the appellant filed a motion to suppress the evidence seized from his home on the basis that he did not voluntarily consent to the search. Before opening statements, the appellant requested that the trial court, considering the evidence from the suppression hearing, rule on the issue. The trial court found that the appellant gave his consent to search freely and voluntarily and denied the motion.

In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). Furthermore, the State, as the prevailing party, is "entitled to the strongest legitimate view of the evidence

-11-

adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23. Moreover, we note that "in evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial." State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

Regarding the voluntariness of the appellant's statement, the Fifth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution generally provide a privilege against self-incrimination to individuals accused of criminal activity, thus necessitating our examination of the voluntariness of a statement taken during custodial interrogation. State v. Callahan, 979 S.W.2d 577, 581 (Tenn. 1998). Specifically, for a confession to be admissible, it must be "'free and voluntary; that is, [it] must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence.'" State v. Smith, 933 S.W.2d 450, 455 (Tenn. 1996) (quoting Bram v. United States, 168 U.S. 532, 542-43 (1897)). We note that if, prior to making a statement, the police inform the accused of his Miranda rights and the accused proceeds to knowingly and voluntarily waive those rights, the statement is then admissible against the accused due to the valid waiver of the privilege against self-incrimination. Callahan, 979 S.W.2d at 581 (citing Miranda v. Arizona, 384 U.S. 436, 444-45 (1966)). In reviewing a trial court's ruling on a motion to suppress, we will uphold the trial court's findings of fact unless the evidence preponderates otherwise. State v. Hicks, 55 S.W.3d 515, 521 (Tenn. 2001).

"In determining whether a confession has been made knowingly and voluntarily, courts must look to the totality of the circumstances." State v. Smith, 42 S.W.3d 101, 109 (Tenn. Crim. App. 2000). Accordingly, we consider the following factors in determining the voluntariness of a confession: the appellant's age; education or intelligence level; previous experience with the police; the repeated and prolonged nature of the interrogation; the length of detention prior to the confession; the lack of any advice as to constitutional rights; the unnecessary delay in bringing the appellant before the magistrate prior to the confession; the appellant's intoxication or ill health at the time the confession was given; deprivation of food, sleep, or medical attention; any physical abuse; and threats of abuse. See State v. Huddleston, 924 S.W.2d 666, 671 (Tenn. 1996). Furthermore, this court has stated,

> Coercive police activity is a necessary prerequisite in order to
> find a confession involuntary. The crucial question is whether
> the behavior of the state's officials was "such as to overbear [the
> appellant's] will to resist and bring about confessions not freely
> self-determined." The question must be answered with
> "complete disregard" of whether or not the accused was truthful

-12-

in the statement.

State v. Phillips, 30 S.W.3d 372, 377 (Tenn. Crim. App. 2000) (citations omitted).

Regarding the appellant's consent to search his home, both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution provide protection for citizens against "unreasonable searches and seizures."  Generally, a warrantless search is considered presumptively unreasonable, thus violative of constitutional protections.  See State v. Walker, 12 S.W.3d 460, 467 (Tenn. 2000).  Our supreme court has said, "It is, of course, well settled that one of the exceptions to the warrant requirement is a search conducted pursuant to consent."  State v. Bartram, 925 S.W.2d 227, 230 (Tenn. 1996) (citing Schneckloth v. Bustamonte, 412 U.S. 218 (1973), and State v. Jackson, 889 S.W.2d 219, 221 (Tenn. Crim. App. 1993)).  "The sufficiency of consent depends largely upon the facts and circumstances in a particular case."  State v. Jackson, 889 S.W.2d 219, 221 (Tenn. 2003).  The prosecution bears the burden of proving valid consent.  See State v. McMahan, 650 S.W.2d 383, 386 (Tenn. Crim. App. 1983).  Furthermore, "'[t]he existence of consent and whether it was voluntarily given are questions of fact.'"  State v. Ashworth, 3 S.W.3d 25, 29 (Tenn. Crim. App. 1999) (quoting McMahan, 650 S.W.2d at 386).

As noted by the trial court, the appellant did not make any incriminating statements from the time of the alleged threat until he received Miranda warnings.  In any event, the appellant was twenty-seven years old at the time of his arrest, had an extensive criminal history, was a high school graduate, and could read.  Nothing indicates that his interview was repeated or prolonged, that he was detained for an excessive period of time prior to his confession, or that he was intoxicated or ill when he gave his statement.  The waiver of rights form shows that Detective Yarnell interviewed him at 7:00 p.m. on the day of his arrest, and the officers provided him with cigarettes and water.  The trial court disbelieved the appellant's claims of threats and abuse, and nothing in the record preponderates against that finding.  Therefore, the trial court properly denied the appellant's motion to suppress his statement.

As to the appellant's cursory claim that he did not voluntarily consent to the search of his home, Tennessee Court of Criminal Appeals Rule 10(b) provides that an argument is subject to waiver if it is not properly supported by citation to the record or appropriate legal authority.  In any event, Detective Yarnell testified that he read a consent to search form to the appellant and that the appellant signed the form.  All of the police officers who testified at the hearing stated that they did not witness anyone threaten or harm the appellant.  Although the appellant claimed that he was scared after the alleged threat and signed the consent to search form only because the officers told him to sign it, the trial court disbelieved the appellant's claim that an officer threatened him.  Once again, nothing preponderates

-13-

against that finding. Therefore, the trial court also properly denied his motion to suppress evidence.

## B. Transcript

Next, the appellant contends that the trial court erred by allowing the State to play a video recording of his statement with a transcript of the statement appearing simultaneously along the bottom of the screen. He also contends that the trial court erred by allowing that version of the video-recorded statement to go to the jury room during deliberations. The State contends that the trial court did not err. We conclude that the appellant is not entitled to relief.

On the first day of the trial, Detective Yarnell told the jury what the appellant said during the appellant's video-recorded interview. The State requested to play the interview for the jury, and the trial court allowed the State to play the video. The video showed the appellant and police officers in an interview room. As the appellant and the officers spoke, their words appeared on the bottom of the screen. After the State played the video, Detective Yarnell explained to the jury that his office prepared the transcript of the interview. The State asked, "And the transcript is offered as an--as an aid to assist the jury, but the evidence is the video?" Detective Yarnell answered, "Yes, ma'am." The State introduced the video containing the added transcript into evidence as Exhibit 66. The State introduced a separate, typed transcript of the appellant's interview for identification purposes only as Exhibit 118.

During jury deliberations, the jury asked to see the video-recorded interview and was provided with Exhibit 66. As soon as the video started to play for the jury, someone noticed that the video contained the added transcript. Exhibit 66 was removed from the jury room, and the State agreed to prepare a video without the transcript. The "clean" video, which became Exhibit 128, was played for the jurors. The appellant moved for a mistrial, arguing that the jury should not have been allowed to view the video with the added transcript. The trial court noted that the jury saw only a small portion of Exhibit 66 before the video was stopped and removed from the jury room and that the portion of the video the jury watched contained only background information about the appellant. The trial court overruled the motion.

On appeal, the appellant contends that the trial court erred by allowing the transcript to be added to the video. He claims that he objected to the State's playing Exhibit 66 during the trial on the basis that "since the jurors were allowed to take notes, the chances that a juror might just write down what was on the screen and thus create his own transcript is greater than in the time before jurors were allowed to take notes." He also claims that the trial court overruled his objection.

-14-

We are puzzled by the appellant's argument. The appellant did not cite to his objection or the trial court's ruling on the objection in the record, and our review of the trial transcript does not reveal that he made any contemporaneous objections to the State's playing Exhibit 66 for the jury or the State's introducing Exhibit 66 into evidence.

Irrespective of the appellant's failure to object to the exhibit, Tennessee Rule of Evidence 1002, also known as the best evidence rule, generally provides that in order to prove "the content of a writing, recording, or photograph, the original writing, recording or photograph is required." The rule's purpose is so "only the best or most accurate proof of written or similar evidence should be admitted, to the exclusion of inferior sources of the same proof, absent some extraordinary justification for the introduction of secondary evidence." Neil P. Cohen et al., Tennessee Law of Evidence § 10.01[2][a] (6th ed. 2011). However,

> [t]ape recordings and compared transcripts are admissible and may be presented in evidence by any witness who was present during their recording or who monitored the conversation and was in a position to identify the declarant with certainty, and provided the testimony of the witness in whole or in part, comports with the other rules of evidence.

State v. Walker, 910 S.W.2d 381, 394-95 (Tenn. 1995). Moreover, "a transcript of a tape may be given to a jury where the jury is instructed that the tape, and not the transcript is the actual evidence." State v. Barnard, 899 S.W.2d 617, 623-24 (Tenn. Crim. App. 1994).

In this case, Detective Yarnell explained that he conducted the appellant's interview and that his office prepared and added the transcript to the video. He acknowledged that the transcript was an aid for the jury and that the video was the evidence. The trial court, though, did not instruct the jury that the video was the evidence. The trial court should have given the instruction. In any event, as noted by the State, the appellant does not claim that a material difference existed between the video and the transcript. See State v. Jimmy Dale Pickett, No. M2005-02434-CCA-R3-CD, 2007 Tenn. Crim. App. LEXIS 131, at **29-33 (Nashville, Feb. 14, 2007). Therefore, the trial court's error in admitting Exhibit 66 into evidence without giving the instruction was harmless. See Tenn. R. App. P. 36(a).

The appellant also claims that the trial court erred by allowing the jury to watch the video with the added transcript during deliberations. However, the record reflects that as soon as the video started to play, it was stopped, and Exhibit 66 was removed from the jury room. The State prepared a video without the transcript, Exhibit 128, which was played for the jurors. Nothing indicates that, other than the removed transcript, Exhibit 128 differed

from Exhibit 66.  The appellant is not entitled to relief.

## C.  Kidnapping Instruction

Finally, the appellant contends that he is entitled to relief because the trial court failed to instruct the jury properly regarding especially aggravated kidnapping in light of State v. White, 362 S.W.3d 559 (Tenn. 2012).  The State argues that White does not apply in this case because the charges for especially aggravated kidnapping and especially aggravated robbery named different victims.  We conclude that White applied in this case, that the jury was not instructed properly regarding especially aggravated kidnapping, and that the error was not harmless beyond a reasonable doubt.

Relevant to this case, Tennessee Code Annotated section 39-13-305(a)(1) defines especially aggravated kidnapping as "false imprisonment, as defined in § 39-13-302 . . . [a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon."  False imprisonment is defined as the knowing removal or confinement of another unlawfully so as to interfere substantially with the other's liberty.  Tenn. Code Ann. § 39-13-302(a).  Our case law reveals a long-standing issue regarding the legitimacy of a kidnapping conviction when the act(s) establishing the offense occurred during an accompanying felony.

In State v. Anthony, 817 S.W.2d 299, 301 (Tenn. 1991), a jury convicted the defendant of the armed burglary of a Shoney's restaurant, the armed robbery of the restaurant's manager, and the aggravated kidnappings of the manager and five other employees.  In a split decision, this court reversed all of the aggravated kidnapping convictions, holding that "[u]nless independent and separate fact patterns for both the armed robbery and the aggravated kidnapping can be proven, appellant can be convicted of only the armed robbery."  Anthony, 817 S.W.2d at 30.  Our supreme court, citing due process concerns, held that before a separate kidnapping conviction may be sustained, there must be a determination of

> whether the confinement, movement, or detention [was] essentially incidental to the accompanying felony and [was] not, therefore, sufficient to support a separate conviction for kidnapping, or whether it [was] significant enough, in and of itself, to warrant independent prosecution and [was], therefore, sufficient to support such conviction.

Id. at 306.  After its own analysis, our supreme court affirmed this court.  Id. at 307-08.

-16-

Later, in State v. Dixon, 957 S.W.2d 532, 535 (Tenn. 1997), our supreme court modified the Anthony court's "essentially incidental" analysis and established a two-prong test for determining whether a separate conviction for kidnapping violates due process. The first step concerned a determination of whether the movement or confinement was beyond that necessary to commit the accompanying felony. Id. If so, the second step concerned ascertaining whether the additional movement or confinement (1) prevented the victim from summoning help; (2) lessened the appellant's risk of detection; or (3) created a significant danger or increased the victim's risk of harm. Id.

Recently, in White, our supreme court expressly overruled Anthony and its progeny, holding that "[t]he separate due process test articulated first in Anthony, and subsequently refined in Dixon . . . , is . . . no longer necessary to the appellate review of a kidnapping conviction accompanied by a separate felony." 362 S.W.3d at 578. Instead, the court held that "whether the evidence, beyond a reasonable doubt, establishes each and every element of kidnapping, as defined by statute, is a question for the jury properly instructed under the law," thereby concluding that a defendant's constitutional concerns are protected by appellate review of the sufficiency of the convicting evidence. Id. at 577-78. Therefore, our supreme court cautioned that "trial courts must ensure that juries return kidnapping convictions only in those instances in which the victim's removal or confinement exceeds that which is necessary to accomplish the accompanying felony." Id. To effectuate this end, our supreme court devised an instruction to be given by trial courts:

> To establish whether the defendant's removal or confinement of the victim constituted a substantial interference with his or her liberty, the State must prove that the removal or confinement was to a greater degree than that necessary to commit the offense of [insert offense], which is the other offense charged in this case. In making this determination, you may consider all the relevant facts and circumstances of the case, including, but not limited to, the following factors:
>
> • the nature and duration of the victim's removal or confinement by the defendant;
>
> • whether the removal or confinement occurred during the commission of the separate offense;
>
> • whether the interference with the victim's liberty was inherent in the nature of the separate offense;

-17-

• whether the removal or confinement prevented the victim from summoning assistance, although the defendant need not have succeeded in preventing the victim from doing so;

• whether the removal or confinement reduced the defendant's risk of detection, although the defendant need not have succeeded in this objective; and

• whether the removal or confinement created a significant danger or increased the victim's risk of harm independent of that posed by the separate offense.

Id. at 580-81 (footnote omitted).

Regarding the appellant's claim, we must first determine whether White is applicable.[3] The State argues that White is inapplicable because the especially aggravated kidnapping and the especially aggravated robbery involved different victims, Mrs. Graves and Mr. Graves, respectively. In support of its claim, the State cites State v. John Lacardo Elliott, No. M2001-01990-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS 987, at *8-10 (Nashville, Nov. 15, 2002), in which this court stated,

> We believe that the kidnapping of Ms. Starks, as alleged in counts two and three of the indictment, had nothing to do with the robbery of Mr. Kelly, an employee of B & S Package Store. See State v. Blouvet, 965 S.W.2d 489, 492 (Tenn. Crim. App. 1997). Unlike the defendants in Anthony, Defendant did not rob the victim of the aggravated kidnapping, Leslie Starks, nor was he charged with that offense. Rather, he was charged with the aggravated robbery of Mr. Kelly and the aggravated kidnapping of Ms. Starks. As the supreme court stated in Anthony, "the real

[3]We note that White was decided after the appellant's trial and after the appellant filed his motion for new trial. However, the appellant raised White at his motion for new trial hearing, and his case was in the "'appellate pipeline'" when the supreme court issued its opinion. State v. Robert Jason Burdick, No. M2012-01071-CCA-R3-CD2013 Tenn. Crim. App. LEXIS 494, at *33 (Nashville, June 11, 2013) (quoting State v. Bennie Osby, No. W2012-00408-CCA-R3-CD, 2012 Tenn. Crim. App. LEXIS 903, at *22 (Jackson, Nov. 2, 2012), perm. to appeal denied, (Tenn. 2013).

issue involves the propriety of a kidnapping conviction where detention of the victim is merely incidental to the commission of another felony, such as robbery or rape." 817 S.W.2d at 300. In this case, the question is whether the detention of Ms. Starks was merely incidental to the aggravated robbery of Mr. Kelly. The Anthony court did not address a situation where the victims of the aggravated kidnapping and the aggravated robbery are two different people.

. . . .

Here, rather than leaving the store, Defendant ordered Ms. Starks at gunpoint to a storage room in the back of the store after the aggravated robbery of Mr. Kelly was complete. Therefore, the aggravated kidnapping of Ms. Starks was not incidental to the aggravated robbery of Mr. Kelly. We believe, however, that when the robbery victim and the kidnapping victim are two different persons, the issue is better characterized as a question of whether sufficient evidence exists to sustain a conviction for aggravated kidnapping.

We are unpersuaded by the State's argument. Our supreme court never said in the Anthony/Dixon/White line of cases that the fact that the victim of the kidnapping was different than the named victim of the accompanying felony eliminated the need for due process analysis. In fact, we note that Anthony involved the aggravated kidnappings of five victims who were different from the victim named in the charge for armed robbery. Moreover, in a recent opinion involving another home invasion, this court concluded, pursuant to White, that "the determination of whether the removal or confinement of [two victims] constituted a substantial interference of either victim's liberty that was to a greater degree than necessary to commit the aggravated robbery of [a third victim] was a question of fact for the jury to resolve." State v. Michael L. Powell and Randall S. Horne, No. E2011-00155-CCA-R3-CD, 2012 Tenn. Crim. App. LEXIS 292, at *24 (Knoxville, May 10, 2012). Accordingly, we conclude that White was applicable to the instant case.

The trial court instructed the jury on especially aggravated kidnapping as follows:

Any person who commits the offense of especially aggravated kidnapping is guilty of a crime.

For you to find the defendant guilty of this offense, the

-19-

state must have proven beyond a reasonable doubt the existence of the following essential elements:

> (1) that the defendant knowingly removed or confined another unlawfully so as to interfere substantially with the other's liberty; and

> (2) that the confinement or removal was accomplished with a deadly weapon or by display of any article used or fashioned to lead the alleged victim to reasonably believe it was a deadly weapon.

Although the trial court instructed the jury in accordance with the pattern jury instruction in effect at that time, it "did not define the key element—the substantial interference with the victim's liberty—as requiring a finding by the jury that the victim's removal or confinement was not essentially incidental to the accompanying felony offense." White, 362 S.W.3d at 580. Given the facts of this case, we conclude that the issue of whether the appellant substantially interfered with Mrs. Graves's liberty in the accompaniment of especially aggravated robbery was fairly raised by the evidence, and, therefore, that the trial court failed to instruct the jury properly on the especially aggravated kidnapping of Mrs. Graves.

We must now determine the effect of the error. The error at issue is a non-structural constitutional error; accordingly, the test to determine whether the error is harmless is "'whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" State v. Climer, 400 S.W.3d 537, 556 (Tenn. 2013) (quoting State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008)).

The evidence at trial shows that the appellant and Holman burst into the Graves home. The appellant grabbed Mr. Graves, and Holman pointed a gun at Mrs. Graves. Seeing a gun pointed at his wife, Mr. Graves broke away from the appellant and ran to the master bedroom to get his own gun with the appellant in hot pursuit. While Holman continued to hold the gun on Mrs. Graves in the living room, the appellant shot Mr. Graves. Upon hearing the shots and calling out to her husband but getting no response, Mrs. Graves pushed Holman away and got a gun Mr. Graves kept by his recliner. Mrs. Graves tried to shoot Holman, but the gun would not fire, and Holman struggled with her. The appellant returned to the living room and told Holman to get the safe, but Holman said he could not because Mrs. Graves had a gun. Mrs. Graves ran from Holman, but he tackled her on the love seat, bit her arm, and took the gun away from her. Then he immediately got the safe out of the closet, and he and the appellant left the residence. Given that the defendants' confinement of Mrs. Graves

occurred during the accompanying robbery, that the confinement was limited to the living room during the entire robbery, and that the confinement ended as soon as the defendants exercised control of the safe, we conclude that whether the appellant's confinement of Mrs. Graves was essentially incidental to the accompanying aggravated robbery was subject to different interpretations by the jury and was not harmless beyond a reasonable doubt. Therefore, the appellant's especially aggravated kidnapping conviction must be reversed and the case remanded for a new trial on that charge.

### III. Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we conclude that the trial court's admitting Exhibit 66 into evidence without instructing the jury that the video, not the transcript, was the evidence was error but harmless. We also conclude that the trial court erred by failing to instruct the jury properly on especially aggravated kidnapping pursuant to White and that the error was not harmless. Therefore, the appellant's conviction for especially aggravated kidnapping is reversed, and the case is remanded to the trial court for further proceedings consistent with this opinion.

_____
NORMA McGEE OGLE, JUDGE